## SUPERIOR COURT OF BALTIMORE CITY

Filed November 20, 1894.

THE AMERICAN DISTRIBUTING COMPANY.

VS.

MARTIN & McANDREWS.

*William A. Fisher* and *Moses R. Walter* for plaintiff.

*William Pinkney Whyte* and *Edgar H. Gans* for defendants.

RITCHIE, J.—

The questions presented by this motion have been argued with great earnestness for nearly three days, and the interest manifested suggests that more is involved in the decision of this case than the amount of the claim sued on. I have followed the arguments of the distinguished counsel with the attention due to the importance of the questions argued.

A good deal has been said during the argument about the Distilling and Cattle Feeding Company, popularly known as the Whiskey Trust, and the character of that corporation. I think it proper to state in the beginning that the question of the legality or illegality of that corporation is in no way whatever involved in this suit; whether it is a trust in violation of the Act of Congress, or whether it is abusing its corporate powers under the laws of Illinois, or not, are questions, with which, in this case, we have nothing to do. So far as this company has any relation to this case, the law to be applied is the same as if it were an individual.

This is a suit brought by the American Distributing Company, a corporation formed under the laws of the State of West Virginia, against these defendants, for the purpose of recovering for spirits bought by them from it in June and July, 1893; the account sued on amounting to about $1,100.00. The defendants do not deny the purchase and delivery of the goods, nor that they were sold at the prices charged, but plead a set-off. It appears from evidence offered by defendants, and admitted subject to exception, that the Distributing Company dealt exclusively in the products of the Distilling and Cattle Feeding Company of the State of Illinois, and upon all purchases from the Distilling Company it was entitled to a rebate of two cents a gallon, payable at the end of five months, provided it had meanwhile purchased its goods only from the Distilling Company. There was also an arrangement, perfectly well understood in the trade, according to which every one who purchased from the Distributing Company the products of the Distilling Company, was entitled to a rebate of seven cents a gallon, payable six months after the purchase, on condition that, during the intervening six months, the purchaser in question should have bought all his supplies, of the character manufactured by the Distilling Company, from one or another of the dealers in the products of the Distilling Company, whose names appear on the back of the rebate vouchers. The sales as made were reported to the Distilling Company and it, thereupon, transmitted to the purchasers rebate vouch-

ers as described. It is not contended, as I understand, that there is anything illegal in this sort of arrangement as to rebates, if made and carried out in good faith. That it is lawful seems to be settled by the cases of Mogul Company vs. McGregor, L. R. App. Cas. 25 (1892) ; In re Greene, 52 Fed. Rep. 104; U. S. vs. Nelson, 52 Fed. R. 646, and National Distilling Company vs. Cream City Co., 56 N. W. Rep. 564.

The defendants in this case began buying the products of the Distilling Company as early as June, 1890; they bought them with the right to a similar rebate, buying directly from the Distilling Company through its recognized agents. Their dealings with the Distilling Company continued up to August, 1891, in the same way. At that time the Distributing Company, composed in part of a large number of those persons who had previously been agents of the Distilling Company, was incorporated, and the defendants continued dealing in the products of the Distilling Company, buying those products from the Distributing Company, and being entitled to and receiving, as stated, rebate vouchers of seven cents a gallon upon their different purchases.

So far as appears from the testimony the goods sold by the Distributing Company were always bought from the Distilling Company and paid for by the Distributing Company before delivery to the purchasers, and if there was any increase or reduction in the price of these goods after any purchase made by the Distributing Company, that company got the benefit or suffered the loss. It is testified to that in one instance the Distributing Company thus lost about $10,000 by a reduction in prices. The defendants now hold a number of these vouchers amounting, according to their face value, to the sum of about $1,700. The set-off they have pleaded does not consist of these vouchers, but of various sums of money (included in prices charged) paid at the times of their respective purchases, corresponding in amount and date with these different vouchers. The defendants allege that to the extent of seven cents or more a gallon, the amounts paid were in excess of the reasonable, or market value of the goods bought, and were fraudulent overcharges; and they claim that, being fraudulent overcharges, they are entitled to set them off against the claim upon which they are now sued. In order to maintain a right to set off these alleged fraudulent overcharges, they contend that the Distributing Company was the agent of the Distilling Company, or if not technically an agent, that it was a sham as a corporation; that its incorporation was a device whereby the Distilling Company might the better practice extortion in arbitrarily and fraudulently raising the prices of its products.

The proof of an agency only would not avail the defendants anything. A mere agency alone, if established, would avail nothing, because the defendants, having stopped their purchases of the Distilling Company's products, could not show that they had complied with the condition of their vouchers; and so the defendants do not stop with the allegation of agency, but, as stated, go further and set up fraud. The charge of the defendants is that the whole thing was a scheme; that even if originally not fraudulent, it was afterwards, in its execution, perverted into a scheme for the purpose of defrauding the purchasers out of the value of their vouchers; that having once obtained them as purchasers of its products, and having continued to hold them as such until the rebate vouchers which they held amounted in value to a very large sum of money, the Distilling Company, through, or in combination with, the Distributing Company, then arbitrarily, without any regard to the market value, or to the fair, reasonable value of its goods, raised the prices for the very purpose of defrauding the defendants out of the value of their vouchers; that the defendants and others in like situation were thus forced to continue buying at extortionate prices, or else lose their rebates on previous purchases. It is claimed that there were such relations or combination between these two companies as to make each liable to any one wronged by these alleged overcharges.

The plaintiff moves to strike out all the evidence offered to show the reasonable or market value of these products as being inadmissible to prove fraudulent overcharges, and all the evidence offered to show agency or combination.

In order to sustain a defence of this kind it becomes necessary to show, in the first place, that there was this alleged extortion; that the prices were unreasonably and fraudulently raised for the purpose of taking advantage of the purchasers after they had been enticed, as it is argued, into the situation to which I have referred, that is the situation of having on hand a large number of these vouchers, the payment of which depended on their continued exclusive purchase for six months of the products of the Distilling Company.

Passing by, for the time, the evidence offered upon the subject of agency and of the relations existing between these two corporations, let us look at the evidence that is offered for the purpose of sustaining the charge that is made, of fraudulently increased prices. It is claimed by defendants that while the condition of the rebate vouchers required the continued purchase for six months of the products of the Distilling Company only, there was an implied condition that the future prices should be reasonable, and not extortionate. This may be assumed, but still the fairness of the prices charged can be tested only by some standard, by the standard of market prices, or by some evidence which will show what was, during the period in question, the fair and reasonable value of these products. No regular market quotations, or exchange prices, are offered, but to meet this exigency, to meet the necessary requirement of some sufficient standard, the defendants offer the transactions of Record & Goldsborough with one of the distilleries that was not in the combination known as the Whiskey Trust, and also the transactions had by Gottschalk & Company with four other distilleries which were not in the combination referred to. These two houses, Goldsborough's and Gottschalk's, were dealing largely with these independent distilleries during the period from about the middle of December, 1892, up to the time of the purchase of the bills which are now sued on, which period covers the vouchers now held by defendants, and the prices that were paid by the defendants to the Distributing Company during the same period, and the prices that were paid

by Goldsborough and Gottschalk for like products to the distilleries with which they dealt, have all been tabulate the sum of $850, applied to the corthis evidence tends to prove the extortion or fraud upon which, among other things, this set-off rests. This is all the evidence upon this point that was offered by the defendants, and, in my judgment, this statement of comparative prices furnishes no evidence of extortion, or of an arbitrary or fraudulent raising of prices by the Whiskey Trust, and is inadmissible.

We find in the first place—and it must be remembered that we are looking for a standard, we are looking for some measure by which the price of the Whiskey Trust may be tested—we find first from this comparative table that, while there were, during this period, many changes in the prices of the products of the Trust, corresponding fluctuations took place in the prices of these other distilleries. These fluctuations, whether increasing or reducing prices, are not peculiar to the Whiskey Trust, but are common alike to it and to all of these five independent distilleries; they are also coincident in point of time, and the changes in the prices of the independent distilleries bear, throughout this period, a constant relation, or ratio, not greatly varying, to the changes in price by the Trust. I can see no reason in the evidence why changes made by the Trust should be considered as made because of the fraudulent motive charged, while corresponding and coincident changes were made by the independent distilleries, to which no such motive is imputed. The reasonable inference rather is that changes which were common to both were caused by the condition of the market, or by some influences and considerations, which operated upon both alike.

The next thing to be noticed in respect to the prices of these five independent distilleries, which are offered as furnishing a standard by which to test the fairness of the prices of the Trust, is that there is an utter want of uniformity in prices as among themselves. In looking over this table I find that there are only six days during the period in question upon which Goldsborough and Gottschalk both bought, but upon not one of these six upon the transitory seizing of the ven-

from which Goldsborough bought the same as those of the distillery from which Gottschalk bought. January 9, 1893, is one of these six days. The prices offered in evidence, or those to which the prices of other spirits are reduced, are the prices of proof spirits delivered in Baltimore. On January 9th, it appears that the Clifton Springs Distillery sold to Goldsborough at $1.22¼ per gallon, and on the same day the distillery from which Gottschalk bought charged him $1.28 per gallon, so that between the price of these distilleries now offered by defendants as a standard of value, there was on that day a difference of five and three-quarter cents per gallon. On January 16th, Goldsborough paid $1.27¼, and Gottschalk paid $1.28; on March 18, Goldsborough paid $1.14¼, and Gottschalk paid $1.12; on March 31, Goldsborough paid $1.14¼, and Gottschalk paid $1.11½; on May 22nd, Goldsborough paid $1.09¼, and Gottschalk paid $1.10; and on June 26th, Goldsborough paid $1.07¾, and Gottschalk paid $1.10. There was thus no uniformity in prices among these independent distilleries, and as far as disclosed by the testimony, there was not a day during the six months in question on which they were, as among themselves, selling at the same figure. It is not possible to find a standard of value from such testimony.

But let us look now more particularly at the prices of the Distributing Company, in connection with the alleged charge of arbitrary and extortionate prices. We find that the defendants, on the 4th of January, which is the date of their earliest voucher, paid $1.37 a gallon. They continued to deal with the Distributing Company until the 5th of July, 1893, and then, it is alleged, the thing had become so bad that it was impossible for them to stand it any longer; the oppression and exorbitant prices were such as that they determined to draw out and to stop dealing in the products of the Whiskey Trust. From his point of view the tabulated prices show that, on January 4th, the date of the earliest unpaid voucher held by defendants, the price was $1.37 per gallon; a few days afterwards it was raised to $1.42; but on the 30th of January, the price was reduced 18 cents a gallon, down to $1.24, and during the rest of the entire period, from January 30th, until the 5th of July, the price never exceeded $1.24; that during this period the price ranged between $1.24 and $1.19, and the very price at which the two purchasers now in suit were made, and which, at last, it is alleged, determined the defendants to raise the present issue with the plaintiff, was $1.19 per gallon, the lowest price at which these products were sold during the entire period covered by the evidence. Instead of tending to prove an arbitrary or fraudulent increase of prices during the period in question, it appears from this evidence that the price on January 26th was $1.42, and on July 5th, it was $1.19, thus showing a reduction of 23 cents a gallon.

These comparative prices may also be considered with reference to their fluctuations, and, in this aspect, we find that the highest price during this period charged by the Trust was $1.42 per gallon and the lowest $1.19, showing a range in fluctuation of 23 cents a gallon. The highest price paid by Goldsborough was $1.27¼ and the lowest was $1.07¾, a range of 19½ cents; the highest price paid by Gottschalk was $1.31½ and the lowest was $1.07, a range of 24½ cents, being one and one-half cent greater than the range of fluctuation in the Trust prices.

Again, if we look at the relative difference between the Trust prices and the prices of the independent distilleries, we find that the latter, after allowing for rebates, were always lower than the former. The greatest relative difference between these prices, including the rebate, was 16 cents a gallon and the smallest was nine cents, but the greatest difference between these prices was not in June or July when the defendants stopped buying the products of the Trust, but it was in January, six months before. The average difference of prices, not allowing for the rebate, was about eleven or twelve cents, and I find that is just about what it was in July, that when the defendants stopped buying, the difference between the Trust prices and the last paid by Goldsborough being 11¼ cents, and the difference between the Trust price and the last paid by Gottschalk being 12 cents.

One thing more about these comparative prices. The prices of the independent distilleries were always low-

er than those of the Distilling Company, and it is argued that this fact is some evidence tending to show extortionate prices by the Trust. In the absence of all evidence showing any standard or market price, however, I cannot see that this fact tends to show that the prices of the Trust were higher than was the fair value of the goods, any more than it shows that the other distilleries were selling at a price lower than the fair value. But we know from common observation that, so long as competition exists, combinations do not attempt to crush it by selling at prices higher than the market or fair value; competition is not overcome in that way; and the inference from the fact in question, if any is to be drawn, would rather seem to be that the independent distilleries made a point of underselling the Trust in order to maintain their trade.

Such is what appears from this evidence of comparative prices, and it is seen, from what has been said, that it does not in any degree tend to prove that the prices of the Whiskey Trust were arbitrary, or fixed with any fraudulent purpose.

But this evidence of the prices of these independent distilleries is inadmissible for other reasons. So far as the testimony shows, there is no element of market value in them. Even if the prices of these five distilleries had been uniform, they would not, even as among the independent distilleries, establish the fair value of such goods, in the absence of all evidence as to whether or not there were other independent distilleries in the country, and of any, how many and what were the prices of such other.

It further appears from the testimony, however, that these prices were simply those at which these two particular houses bought their goods from the distilleries in question, and both Goldsborough and Becker of the firm of Gottschalk & Company, testify that they have no knowledge as to whether these distilleries sold to them at their usual prices, nor as to the prices at which they sold to anyone whatever except themselves; all they know is that these were the prices at which they bought. This, of course, would not be admissible to show market value, even if these five distilleries embraced all the independent distilleries of the country, and their prices to these two houses had been uniform.

It thus appears that in no aspect in which these prices paid by Goldsborough and Gottschalk can be regarded can the evidence of them be admissible to show that the prices of the Trust, less the rebate, or even without deducting the rebate, were above the market price, or were unreasonable and extortionate. The evidence of them must therefore be stricken out. There being no other evidence offered to prove the alleged fraudulent overchanges, there is thus no evidence in the case on this point; and all evidence offered to prove agency or combination, therefore, becomes irrelevant and immaterial; and consequently inadmissible; and must also be struck out.

*The motion will be granted.*